**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANGELICA CHESTLEIGH,<br>Plaintiff,<br>v.<br>ENVISION UNLIMITED,<br>Defendant. | Case No.<br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Angelica Chestleigh, by and through counsel, and for her Complaint against Defendant Envision Unlimited ("Envision"), alleges as follows:

**NATURE OF THE ACTION**

1. This is a disability and discrimination action arising from Envision's unlawful treatment and termination of Chestleigh. After working for Envision for two years as a Care Manager, Chestleigh was hospitalized and diagnosed with a neurological condition requiring medical leave. When she returned from leave, she asked for limited restrictions certified by her treating neurologist. Envision denied two of Chestleigh's requested accommodations, declaring that those limitations disqualified Chestleigh from the essential functions of the position. When Chestleigh proposed a concrete alternative, Envision instead gave Chestleigh ten days to find another position within the company on her own or be terminated.

2. Despite Envision requiring Chestleigh to compete for a position by going through "the full application process" rather than facilitate a transfer, Chestleigh found another position within Envision. The new position reduced her compensation by $10,000, reduced her paid sick

leave, imposed a new probation period, and carried none of Chestleigh's requested accommodations.

3. Chestleigh then filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Before she filed that charge, her personnel record contained no formal discipline of any kind. After Envision learned of the charge, it passed Chestleigh over for a promotion her own departing supervisor had recommended her for, began additional supervisory check-ins, and placed her on a 30-day Performance Improvement Plan, and then terminated her.

4. Envision's stated reasons for its treatment of Chestleigh were false, unsupported, and a pretext for disability discrimination and retaliation. Chestleigh brings this action under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 et seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq.; and the Illinois Human Rights Act, 775 ILCS 5/1-101 et seq.

**PARTIES**

5. Plaintiff Angelica Chestleigh is an individual who was employed by Defendant Envision Unlimited at all relevant times. At all relevant times, Chestleigh was a "qualified individual" within the meaning of 42 U.S.C. § 12111(8) and an "employee" within the meaning of 42 U.S.C. § 12111(4), 29 U.S.C. § 2611(2), and 775 ILCS 5/2-101(A).

6. Defendant Envision Unlimited employed 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year. Envision also employed 50 or more employees within 75 miles of Envision's primary office in Chicago, Illinois at all relevant times.

7. Envision is an "employer" within the meaning of 42 U.S.C. § 12111(5), 29 U.S.C. § 2611(4), and 775 ILCS 5/2-101(B), and was engaged in an industry affecting commerce.

8. Upon information and belief, at all relevant times, Envision was a recipient of federal financial assistance within the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, including by way of funding administered through the Illinois Department of Human Services and Medicaid reimbursement.

## JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction over Chestleigh's federal claims under 28 U.S.C. §§ 1331 and 1343, and under 42 U.S.C. § 12117(a), which incorporates 42 U.S.C. § 2000e-5(f).

10. This Court has supplemental jurisdiction over Chestleigh's claims arising under Illinois law pursuant to 28 U.S.C. § 1367(a), because those claims arise from the same case or controversy as the federal claims.

11. Venue is proper in this District under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3). Envision maintains its principal place of business in this District; the unlawful employment practices alleged occurred in this District; and the employment records relevant to those practices are maintained in this District.

12. Chestleigh has satisfied all conditions precedent to filing suit. Chestleigh filed an administrative charge of discrimination with the Equal Employment Opportunity Commission, received a right-to-sue notice dated July 29, 2026, and is filing this action within the time permitted by law. Chestleigh also filed an administrative charge of discrimination with the Illinois Department of Human Rights, received a right-to-sue notice dated September 30, 2026, and is filing this action within the time permitted by law.

## FACTUAL ALLEGATIONS

### A. Chestleigh's Employment as a Care Manager for Envision

13. Envision provides mental health, developmental disability, and community living services at sites throughout the Chicagoland area.

14. Chestleigh began working for Envision as a full-time Care Manager on or around October 9, 2023.

15. Chestleigh served as a Care Manager on Envision's mental-health and transition program, working with clients moving out of facilities and into independent living.

16. Envision's job posting for the Care Manager position contained no physical requirements of any kind. The posting contained no reference to walking, ambulating, standing, climbing, stairs, lifting, or carrying, and no weight limitation. The only physical or logistical requirement stated is driving.

### B. Chestleigh's Diagnosis of a Neurological Condition and Medical Leave

17. Approximately two years after Chestleigh began working for Envision, in or around August 2025, Chestleigh was hospitalized and diagnosed with a neurological condition that affected her neurological and musculoskeletal functions.

18. On or around August 21, 2025, the University of Chicago Medical Center Neurology Clinic issued a letter stating: "Due to recent symptoms, it is recommended that [Chestleigh] refrain from working until she is reevaluated on November 11, 2025." Chestleigh provided that letter to Envision and commenced a medical leave to undergo rehabilitation for her neurological condition.

19. On or around November 5, 2025, Chestleigh wrote to Envision: "I have an important appointment with my doctor on Tuesday November 11th. After that I will send in my exact date of return to work and any accommodations they suggest."

20. On or around November 14, 2025, Chestleigh wrote to Envision: “Can you send me the FMLA form I need to give to my doctor? We had the disability leave form and that isn't right.” Envision responded by providing Chestleigh with an ADA medical certification form instead of the requested FMLA form: “[T]he next step in the process is to have your healthcare provider complete the attached ADA medical certification form. Once completed, please return it within **15 days** so we can continue reviewing your request and determine the appropriate accommodation.”

21. Envision never provided Chestleigh with the requested FMLA certification form. Envision never issued Chestleigh a Notice of Eligibility and Rights & Responsibilities (Form WH-381) or a Designation Notice (Form WH-382), and never advised her of her rights under the FMLA.

22. At the time of her request, Chestleigh had been employed by Envision for more than twenty-five months as a full-time exempt employee and was an eligible employee within the meaning of 29 U.S.C. § 2611(2).

**C. Chestleigh’s Reasonable Accommodation Request**

23. On or around November 17, 2025, Chestleigh’s treating neurologist, Jennifer Wiseman, M.D., completed the “Reasonable Accommodation Request (Physician's Form)” that Envision provided to Chestleigh. Dr. Wiseman certified the following limited restrictions on Chestleigh’s major life activities as a result of her health condition: “Patient is unable to ambulate for long distances. Please allow patient to work from home when she is able to. Patient to refrain climbing stairs when able. She should carry no more than 25 pounds at a time and be absent from work without penalty for follow up and treatment appointments.”

24. On or around November 18, 2025, Chestleigh completed Envision’s “Reasonable Accommodations for Disabled Persons Request Form.” Chestleigh requested five limited

accommodations: (1) the ability to work from home; (2) refraining from climbing stairs; (3) not carrying more than 25 pounds; (4) the ability to be absent from work for medical appointments; and (5) time off during a flare-up of her medical condition. On the form, Chestleigh attested: "I have reviewed and am aware of the essential functions of the position and I am qualified to perform the job given reasonable accommodation(s)."

25. On or around November 19, 2025, Envision requested that Chestleigh's physician quantify the remote-work recommendation.

26. On or around November 24, 2025, Chestleigh provided Envision with a signed addendum from Dr. Wiseman: "Please allow patient to work remotely one day per week. During times of symptom flare please allow an additional work from home day (2 days/week)."

### D. Envision Denies the Reasonable Accommodation Request and Does Not Address Chestleigh's Proposed Alternative

27. On or around December 2, 2025, Envision told Chestleigh that it was denying two of Chestleigh's accommodation requests: (1) walking long distances and (2) climbing stairs.

28. On or around December 3, 2025, Chestleigh proposed to Envision that she drop the restriction on walking long distances if needed. She also proposed that Envision accommodate the restriction on climbing stairs by assigning her to locations with elevators or locations where members are on the first floor. Chestleigh said that "[w]ith those adjustments, I believe I'd be able to do my job without an issue."

29. Envision told Chestleigh that it would "take [her] request into consideration during the review process." In reality, Envision never evaluated Chestleigh's proposal or engaged in an interactive process.

30. On or around December 5, 2025, Envision sent Chestleigh an ADA Accommodation Determination Letter (though the letter is dated December 4, 2025). The letter

granted three accommodations: "We are able to approve the accommodation as presented: limited lifting, working from home 1–2 days per week, and time off for treatment or medical appointments."

31. The letter denied the remaining two: "We are unable to accommodate the restrictions related to ambulating long distances and avoiding stairs as presented due to essential requirements of your position. Physically navigating varied environments in the community while meeting with clients is a core function of the Care Manager MH role. As a result, these requested restrictions would prevent you from performing essential job duties and would create undue hardship for the patient/member and the agency."

32. The letter made no mention of elevators, first-floor client assignments, caseload assignment, or any other alternative within the Care Manager position.

33. The essential functions Envision asserted in the letter such as frequent community travel, accompanying clients to housing searches and appointments, home visits, post-discharge monitoring, and facilitating transitions to independent living, appear nowhere in Envision's own contemporaneous public description of the position, which imposes no physical requirement other than driving.

34. Envision's letter directed Chestleigh to find a new position on her own: "Since we are unable to reasonably accommodate you in your current job, please look on our website www.envisionunlimited.org for a list of positions you may be qualified for, if you are interested in being considered for an opening please contact me no later than 12/15/2025." The letter then stated: "If there are no suitable positions, your employment with Envision Unlimited will end effective 12/16/2025."

35. Envision identified no open positions for Chestleigh, offered no placement, and made no assessment of which open roles she was qualified for. Envision placed the entire burden of reassignment on Chestleigh and gave her ten days to find a new position on her own or be terminated.

**E. Envision Refuses to Reassign Chestleigh and Requires Her to Compete for a New Position.**

36. Despite Envision's lack of cooperation, Chestleigh identified a specific open position at Envision and told Envision: "The Quality Assurance Coordinator position sounds like the best fit for me. https://recruiting.paylocity.com/Recruiting/Jobs/Details/3666424 Can you connect me to the recruiter for this position?"

37. Envision, again, provided no assistance to Chestleigh. Rather, on or around December 8, 2025, Envision told Chestleigh to apply for the position herself, telling Chestleigh: "You can log into Paylocity to apply under the career tab on the employee self service portal."

38. Unable to locate the "portal" and facing Envision's self-imposed deadline, Chestleigh applied through the external job website Indeed.com. That afternoon she told Envision: "I have turned in an application on Indeed for this position. I would like to transfer to it as soon as possible."

39. On or around December 9, 2025, Envision told Chestleigh that "[a]s part of this process, this would not be considered a transfer. You would instead go through the full application process for this role."

40. Envision also told Chestleigh that the Quality Assurance Coordinator position was "hybrid — it is remote-based and requires travel to our various Chicagoland sites approximately 1-2 times per week (or several times per month, depending on needs."

41. Concerned that Envision was making her go through a full application process for the role rather than offering her a transfer for her disability and worried about Envision's upcoming deadline for finding a new position, Chestleigh asked Envision: "[W]hat makes this a full application process and not a transfer since the company isn't able to provide the accommodations for my previous position? Are there other positions that are direct transfer? If I'm still in the application process past the 16th what happens to my standing at Envision?"

42. Envision never answered whether any position was available to Chestleigh as a direct transfer. Envision merely told Chestleigh that she had to go through the full application and interview process. Envision told Chestleigh that if she was still in the interview process by the 16th, she could be an employee "on unpaid leave status."

**F. Chestleigh Accepts a New Position That Was Materially Inferior To Her Prior Position.**

43. Under threat of termination if she did not find, apply for, win, and accept a new position, Chestleigh interviewed for and was offered the Quality Assurance Coordinator position.

44. She accepted the offer of employment as Quality Assurance Coordinator on or around December 15, 2025, one day before Envision's threatened termination date. Chestleigh accepted the position because the alternative Envision presented was termination of her employment.

45. The Quality Assurance Coordinator position was materially inferior to the Care Manager position in several respects.

46. The Quality Assurance Coordinator position paid $50,000 annually. Chestleigh's Care Manager position had paid $60,000 annually. By moving from Care Manager to Quality Assurance Coordinator, Chestleigh suffered a compensation reduction of $10,000 per year.

47. The Quality Assurance Coordinator position reduced Chestleigh's paid sick leave from eight days per year to three days per year.

48. The Quality Assurance Coordinator position imposed a new six-month introductory period during which Envision could "determine whether [Chestleigh] can perform the requirements of the job," notwithstanding that Chestleigh had by then been continuously employed by Envision for more than two years and had already successfully completed the similar six-month probationary period for the Care Manager position when she first started with Envision.

49. Envision did not carry the three accommodations it had granted on December 4, 2025—remote work one to two days per week, a 25-pound lifting limit, and time off for treatment appointments—into Chestleigh's new position.

### G. Chestleigh Files an EEOC Charge And Envision Immediately Escalates Adverse Actions Towards Chestleigh In Response.

50. On or around March 25, 2026, Chestleigh filed EEOC Charge No. 440-2026-05515 against Envision.

51. On information and belief, Envision received notice of the EEOC Charge on or around March or April 2026.

52. Soon after learning of the EEOC Charge, Envision began a series of escalating adverse actions towards Chestleigh.

53. Prior to April 2026, Chestleigh had no formal discipline of any kind in her personnel record. When Chestleigh asked Envision's human resources department to review her employee record approximately one month into the Quality Assurance Coordinator role, she was told there was nothing on it.

54. During her tenure in the Quality Assurance Coordinator role, Chestleigh applied for her supervisor's position, which would have involved less walking and a return to compensation closer to her prior salary. Her supervisor, who was departing, told her he believed she could do the job and recommended her. On information and belief, after Envision received notice of Chestleigh’s EEOC Charge, Envision hired another candidate instead.

55. In April 2026, Envision began additional supervisory check-ins with Chestleigh. On information and belief, these additional supervisory check-ins began after Envision received notice of Chestleigh’s EEOC Charge.

56. On April 30, 2026, Envision placed Chestleigh on a thirty-day Performance Improvement Plan (“PIP”). The PIP identified three areas of concern: health and safety inspection delays and incomplete documentation; inaccurate drill reporting and lack of follow-up communication; and incomplete scheduling of file reviews.

57. None of the three criticisms in the PIP identifies a single date, file name, inspection number, drill, or metric. The PIP imposes 100-percent compliance standards with a completion date of "Immediate and ongoing."

58. The PIP does not mention the ADA, Chestleigh’s disability, her accommodation request, or any of the accommodations Envision granted her on December 4, 2025.

59. The PIP nevertheless repeats, verbatim, under each of its three improvement goals, the following clause: “When time off is needed that conflicts with due dates, ensure that items are turned in prior to the due date or immediately upon return. If the time off conflicts with a meeting or in-person event, ensure that the meeting or in-person event gets immediately re-scheduled.”

60. On or around May 20, 2026, Envision issued Chestleigh a written Verbal Warning concerning preparations for a Bureau of Quality Management survey, warning that "if you are unable to meet these expectations additional corrective action may be warranted, up to and including termination."

61. On May 26, 2026, Envision issued a written memorandum purportedly documenting PIP non-compliance and stating: "At this time, you are not meeting the expectations outlined in your Performance Improvement Plan. As stated in the PIP, failure to demonstrate immediate and sustained improvement may result in further disciplinary action, up to and including termination."

**H. Envision Terminates Chestleigh and Engages In Post-Termination Misconduct**

62. The PIP's stated thirty-day term expired on or about May 30, 2026. On or around June 1, 2026, Envision terminated Chestleigh's employment.

63. At the time of termination, Envision told Chestleigh that Envision would pay her COBRA premiums in full for two months and would not contest her application for unemployment benefits. Envision initially honored both commitments.

64. However, shortly afterward, Envision reversed course and asserted that Chestleigh owed Envision approximately $10,000 in unpaid health insurance premiums purportedly accrued during her 2025 medical leave.

65. Envision's asserted debt is inconsistent with its own practice and with its payroll records. Envision had deducted approximately $300 to $400 per month from Chestleigh's paychecks toward those premiums following her return to work, and had administered Chestleigh's earlier short-term disability leave on different terms.

66. Chestleigh requested an itemized accounting of the asserted debt. Envision said it would provide one but never did. Chestleigh followed up by telephone and by email on multiple occasions but received no response from Envision.

67. Envision then offered to forgive the purported $10,000 debt if Chestleigh would sign a document Envision sent to her. Chestleigh declined to sign anything without first receiving the itemized accounting she had requested. Envision never produced the accounting.

## CLAIMS FOR RELIEF

### COUNT I
### Failure to Provide Reasonable Accommodation
### 42 U.S.C. § 12112

68. Chestleigh incorporates by reference each of the preceding paragraphs as though fully set forth herein.

69. The ADA requires an employer to make reasonable accommodations to the known physical limitations of an otherwise qualified individual with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business.

70. Chestleigh is a qualified individual with a disability who, with reasonable accommodation, could perform the essential functions of the Care Manager position.

71. Chestleigh requested reasonable accommodations and Envision had actual notice of her disability and her need for accommodation.

72. Reasonable accommodations were available, including assignment to program sites with elevator access, assignment to clients housed on the first floor, adjustment of caseload geography, expanded remote work, or a combination of these measures. Each was proposed to or plainly available to Envision, and none would have imposed an undue hardship.

73. Envision denied Chestleigh's ambulation and stair restrictions, asserted undue hardship without conducting or documenting any analysis, and never evaluated the specific alternative Chestleigh proposed.

74. Envision cannot demonstrate that the proposed accommodation would impose an undue hardship on the operation of its business.

75. Envision's conduct violated 42 U.S.C. § 12112(b)(5)(A) and was undertaken with malice or reckless indifference to Chestleigh's federally protected rights.

76. As a direct and proximate result of Envision's actions, Chestleigh lost her position, lost $10,000 in annual compensation, lost benefits, was ultimately terminated, and suffered emotional distress, humiliation, and other compensable harm.

**COUNT II**
**Failure to Engage in the Interactive Process**
**42 U.S.C. § 12112**

77. Chestleigh incorporates by reference each of the preceding paragraphs as though fully set forth herein.

78. Upon receiving Chestleigh's accommodation request, Envision was obligated to engage in a flexible, interactive process to identify an effective reasonable accommodation.

79. Envision caused the breakdown of that process. It never completed its own accommodation form or obtained its ADA Coordinator's signature; it responded to Envision's concrete alternative proposal with a single non-responsive sentence; it declared the process "ongoing" on December 2, 2025 and issued a final determination with a separation date on December 4, 2025; and, upon information and belief, it conducted no internal deliberation.

80. Chestleigh at all times participated in the process in good faith, supplying every document Envision requested within Envision's own self-imposed deadlines.

81. Had Envision engaged in the interactive process in good faith, a reasonable accommodation would have been identified that permitted Chestleigh to remain in the Care Manager position.

82. As a direct and proximate result of Envision's actions, Chestleigh lost her position, lost $10,000 in annual compensation, lost benefits, was ultimately terminated, and suffered emotional distress, humiliation, and other compensable harm.

**COUNT III**
**Failure to Reassign to a Vacant Position**
**42 U.S.C. § 12111 and 12112**

83. Chestleigh incorporates by reference each of the preceding paragraphs as though fully set forth herein.

84. Reassignment to a vacant position is a reasonable accommodation expressly enumerated in 42 U.S.C. § 12111(9)(B).

85. Where an employee can no longer perform her current position because of a disability, the ADA ordinarily requires the employer to place a qualified employee in a vacant position rather than require her to compete for it.

86. Envision determined that Chestleigh could not be accommodated in the Care Manager position, which triggered its obligation to reassign her.

87. A vacant position existed. The Quality Assurance Coordinator position was open, and Chestleigh identified it to Envision. Chestleigh was qualified for the position.

88. Envision refused to reassign Chestleigh. Envision told Chestleigh her move "would not be considered a transfer" and that she would have to "go through the full application process for the role." Envision never answered Chestleigh's direct question whether any position was available as a direct transfer.

89. Envision required Chestleigh to compete, as an outside applicant would, for the accommodation to which she was entitled, and conditioned her continued employment on the outcome of that competition.

90. As a direct and proximate result of Envision's actions, Chestleigh lost her position, lost $10,000 in annual compensation, lost benefits, was ultimately terminated, and suffered emotional distress, humiliation, and other compensable harm.

**COUNT IV**
**Disability Discrimination**
**42 U.S.C. § 12112**

91. Chestleigh incorporates by reference each of the preceding paragraphs as though fully set forth herein.

92. The ADA prohibits an employer from discriminating against a qualified individual on the basis of disability in the terms, conditions, and privileges of employment, and from limiting, segregating, or classifying an employee in a way that adversely affects her status because of disability.

93. Chestleigh is a qualified individual with a disability.

94. Envision subjected Chestleigh to adverse employment actions because of her disability, including removing her from the Care Manager position, reducing her annual compensation by $10,000, imposing a new six-month introductory period, reducing her paid sick leave, denying her the supervisory position she sought, subjecting her to a Performance Improvement Plan and escalating written discipline, reassigning her work to others, and terminating her employment on June 1, 2026.

95. Envision's stated reasons for these actions are pretextual. Envision's essential-function rationale is contradicted by its own job posting; its undue-hardship rationale

rests on no analysis; and its performance rationale rests on criticisms that identify no date, document, or metric.

96. Envision limited, segregated, and classified Chestleigh in a way that adversely affected her status as an employee because of her disability, in violation of 42 U.S.C. § 12112(b)(1).

97. As a direct and proximate result of Envision's actions, Chestleigh lost her position, lost $10,000 in annual compensation, lost benefits, was ultimately terminated, and suffered emotional distress, humiliation, and other compensable harm.

**COUNT V**
**Retaliation**
**42 U.S.C. § 12203**

98. Chestleigh incorporates by reference each of the preceding paragraphs as though fully set forth herein.

99. The ADA prohibits an employer from discriminating against an individual because she has opposed an act or practice made unlawful by the Act, or because she has made a charge or participated in a proceeding under the Act.

100. Chestleigh engaged in protected activity, including requesting reasonable accommodations, objecting to Envision's handling of those requests, challenging Envision's refusal to treat her move as a transfer, and filing a charge with the EEOC.

101. Envision knew of each of these activities.

102. Envision took materially adverse actions against Chestleigh thereafter, including conditioning her continued employment on competitive application, reducing her compensation, imposing a new introductory period, denying her the supervisory position she sought, placing her on a Performance Improvement Plan, issuing escalating written discipline with express threats of

termination, terminating her employment, and thereafter asserting an unsubstantiated $10,000 debt against her and offering to forgive it in exchange for her signature.

103. A causal connection exists between Chestleigh's protected activity and Envision's adverse actions. Upon information and belief, Envision received notice of Chestleigh's EEOC Charge and then shortly thereafter filled the supervisory position she had sought, placed her on a Performance Improvement Plan, and terminated her approximately one month later. Chestleigh had no prior discipline in her personnel record.

104. Envision's stated reasons for these actions were not the true reasons but a pretext for retaliation.

105. As a direct and proximate result of Envision's actions, Chestleigh lost her position, lost $10,000 in annual compensation, lost benefits, was ultimately terminated, and suffered emotional distress, humiliation, and other compensable harm.

**COUNT VI**
**Interference, Coercion, and Intimidation**
**42 U.S.C. § 12203(b)**

106. Chestleigh incorporates by reference each of the preceding paragraphs as though fully set forth herein.

107. The ADA makes it unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of rights granted or protected by the ADA.

108. Chestleigh exercised rights protected by the ADA when she requested and used reasonable accommodation.

109. Envision coerced, threatened, and interfered with Chestleigh's exercise of her ADA rights by conditioning her continued employment on locating her own vacancy within a short period of time; by threatening that her "employment with Envision Unlimited will end effective 12/16/2025"; by offering unpaid leave as the sole alternative; by imposing PIP terms

that penalize her use of accommodations Envision had granted; and, after her termination and after she had filed a charge with the EEOC, by asserting an unsubstantiated five-figure debt against her, refusing to itemize it, and conditioning its forgiveness on her signature.

110. Envision's conduct would dissuade a reasonable employee from requesting or using a reasonable accommodation.

111. As a direct and proximate result of Envision's actions, Chestleigh lost her position, lost $10,000 in annual compensation, lost benefits, was ultimately terminated, and suffered emotional distress, humiliation, and other compensable harm.

**COUNT VII**
**Disability Discrimination and Failure to Accommodate**
**29 U.S.C. § 794**

112. Chestleigh incorporates by reference each of the preceding paragraphs as though fully set forth herein.

113. Section 504 of the Rehabilitation Act of 1973 prohibits any program or activity receiving federal financial assistance from excluding, denying benefits to, or discriminating against an otherwise qualified individual with a disability by reason of her disability.

114. Chestleigh is an individual with a disability.

115. Upon information and belief, Envision is a recipient of federal financial assistance.

116. Chestleigh was otherwise qualified to perform the essential functions of her position with reasonable accommodation.

117. Envision denied Chestleigh reasonable accommodation, denied her reassignment, and subjected her to adverse employment actions by reason of her disability.

118. As a direct and proximate result of Envision's actions, Chestleigh lost her position, lost $10,000 in annual compensation, lost benefits, was ultimately terminated, and suffered emotional distress, humiliation, and other compensable harm.

**COUNT VIII**
**Interference with FMLA Rights**
**29 U.S.C. § 2615**

119. Chestleigh incorporates by reference each of the preceding paragraphs as though fully set forth herein.

120. The FMLA makes it unlawful for an employer to interfere with, restrain, or deny the exercise of any right provided by the Act.

121. Chestleigh was an eligible employee, Envision was a covered employer, and Chestleigh had a serious health condition within the meaning of 29 U.S.C. § 2611(11).

122. Chestleigh gave Envision notice of her need for FMLA leave, including by expressly requesting an FMLA certification form in writing on or around November 14, 2025.

123. Envision interfered with her FMLA rights by failing to provide Chestleigh the requested FMLA form, failing to issue a FMLA eligibility notice, a rights and responsibilities notice, or a designation notice, and failing to advise Chestleigh of her FMLA rights.

124. Envision instead substituted its ADA process for the FMLA process, and thereafter treated Chestleigh's medical absences as a basis for adverse action.

125. Envision's failures interfered with, restrained, and denied Chestleigh's exercise of rights under the FMLA, and prejudiced her by depriving her of job-protected leave and of the ability to structure her leave with knowledge of her rights.

126. Envision's violations were not in good faith, and Envision had no reasonable grounds to believe its conduct complied with the FMLA.

127. Chestleigh is entitled to liquidated damages under 29 U.S.C. § 2617(a)(1)(A)(iii).

128. As a direct and proximate result of Envision's actions, Chestleigh lost her position, lost $10,000 in annual compensation, lost benefits, was ultimately terminated, and suffered emotional distress, humiliation, and other compensable harm.

**COUNT IX**
**Retaliation for Exercise of FMLA Rights**
**29 U.S.C. § 2615**

129. Chestleigh incorporates by reference each of the preceding paragraphs as though fully set forth herein.

130. The FMLA prohibits an employer from discharging or discriminating against an employee for opposing a practice made unlawful by the Act or for exercising rights under it, and prohibits an employer from using an employee's protected leave as a negative factor in employment decisions.

131. Chestleigh engaged in protected activity by taking medical leave and by requesting FMLA leave.

132. Envision thereafter subjected Chestleigh to materially adverse actions, including a Performance Improvement Plan and the termination of her employment.

133. Envision used Chestleigh's protected leave as a negative factor in its employment decisions, in violation of 29 U.S.C. § 2615(a)(2).

134. Chestleigh is entitled to liquidated damages under 29 U.S.C. § 2617(a)(1)(A)(iii).

135. As a direct and proximate result of Envision's actions, Chestleigh lost her position, lost $10,000 in annual compensation, lost benefits, was ultimately terminated, and suffered emotional distress, humiliation, and other compensable harm.

**COUNT X**
**Disability Discrimination and Failure to Accommodate**
**775 ILCS 5/2-102(A)**

136. Chestleigh incorporates by reference each of the preceding paragraphs as though fully set forth herein.

137. The Illinois Human Rights Act makes it a civil rights violation for an employer to act with respect to discharge, discipline, tenure, or the terms, privileges, or conditions of employment on the basis of unlawful discrimination, which includes discrimination on the basis of physical disability unrelated to the employee's ability to perform the duties of the position.

138. Envision is an "employer" within the meaning of 775 ILCS 5/2-101(B).

139. Chestleigh has a physical disability within the meaning of 775 ILCS 5/1-103(I) that is unrelated to her ability to perform the duties of her position with reasonable accommodation.

140. Chestleigh was otherwise qualified to perform the essential functions of her position with reasonable accommodation.

141. Envision denied Chestleigh reasonable accommodation, denied her reassignment, and subjected her to adverse employment actions by reason of her disability.

142. Envision committed a civil rights violation under 775 ILCS 5/2-102(A) by acting with respect to Chestleigh's discharge, discipline, tenure, and the terms, privileges, and conditions of her employment on the basis of unlawful discrimination, and by failing to provide reasonable accommodation for her known physical disability

143. As a direct and proximate result of Envision's actions, Chestleigh lost her position, lost $10,000 in annual compensation, lost benefits, was ultimately terminated, and suffered emotional distress, humiliation, and other compensable harm.

**COUNT XI**
**Retaliation**
**775 ILCS 5/6-101**

144. Chestleigh incorporates by reference each of the preceding paragraphs as though fully set forth herein.

145. The Illinois Human Rights Act makes it a civil rights violation to retaliate against a person because she has opposed that which she reasonably and in good faith believes to be unlawful discrimination, or because she has made a charge, filed a complaint, testified, assisted, or participated in a proceeding under the Act.

146. Chestleigh engaged in protected activity, including requesting reasonable accommodations, objecting to Envision's handling of those requests, challenging Envision's refusal to treat her move as a transfer, and filing a charge with the EEOC.

147. Envision knew of each of these activities.

148. Envision took materially adverse actions against Chestleigh thereafter, including conditioning her continued employment on competitive application, reducing her compensation, imposing a new introductory period, denying her the supervisory position she sought, placing her on a Performance Improvement Plan, issuing escalating written discipline with express threats of termination, terminating her employment, and thereafter asserting an unsubstantiated $10,000 debt against her and offering to forgive it in exchange for her signature.

149. A causal connection exists between Chestleigh's protected activity and Envision's adverse actions. Upon information and belief, Envision received notice of Chestleigh's EEOC Charge and then shortly thereafter filled the supervisory position she had sought, placed her on a Performance Improvement Plan, and terminated her approximately one month later. Chestleigh had no prior discipline in her personnel record.

150. Envision's stated reasons for these actions were not the true reasons but a pretext for retaliation.

151. As a direct and proximate result of Envision's actions, Chestleigh lost her position, lost $10,000 in annual compensation, lost benefits, was ultimately terminated, and suffered emotional distress, humiliation, and other compensable harm.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Angelica Chestleigh respectfully requests judgment in her favor and against Defendant Envision Unlimited, awarding:

1. Back pay, including all lost wages, salary, bonuses, benefits, and other compensation from the date of her termination to the date of judgment, with prejudgment interest;
2. Front pay;
3. Compensatory damages for emotional distress, mental anguish, humiliation, and related harm;
4. Punitive damages;
5. Liquidated damages;
6. Reasonable attorneys' fees and costs;
7. Prejudgment and post-judgment interest; and
8. Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff Angelica Chestleigh demands a jury trial on all issues so triable.

Dated: October 19, 2026

Respectfully submitted,

/s/ Anand C. Mathew

Andrew R. Greene
M. Katherine Boychuk
Anand C. Mathew
ASG LAW FIRM, LLC
181 W Madison St., Suite 4700
Chicago, IL 60602
(312) 274-2031
andy@asglawfirm.com
kay@asglawfirm.com
anand@asglawfirm.com

*Attorneys for Plaintiff Angelica Chestleigh*